## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. CR-03-BE-0530-S |
| RICHARD M. SCRUSHY, | |
| **Defendant.** | |

## MEMORANDUM OPINION

Before the court is the motion filed by Media Intervenors Bloomberg News, Dow Jones

& Company, Inc., The Associated Press, The Reporters Committee for Freedom of the Press,

The Hearst Corporation, and The Birmingham News to Unseal Documents (doc. 521).  The

motion seeks the unsealing of "all documents"[1] filed under seal in this case, as well as all

Exhibits, and all transcripts of sidebar and chambers conferences not previously filed or released

to the public.

The court provided all interested parties the opportunity to respond in writing to the

---

[1]In a letter, the Intervenors clarified that they seek "pleadings, motions, oppositions, briefs, replies, letters, exhibits, tapes, and any other papers and material filed with the Court Clerk in this criminal action and previously sealed by order of this Court."  Letter from Gilbert E. Johnston, Jr., August 9, 2005.  In reviewing documents for release, the court has not limited its review to documents actually filed with the Clerk and ordered sealed.  For example, many of the transcripts that the court has ordered released through this order and prior orders had never been transcribed or filed at all because none of the parties had requested those transcripts; indeed in an ordinary case, court reporters rarely are even present for routine status conferences.  Because nothing about this case was routine, a court reporter recorded numerous conferences just in case questions arose that could have developed into issues on appeal.  Transcripts of many such conferences were only generated in response to this request.
       During the trial, transcripts were made available to the press on a daily basis, excluding non-public conferences.  Transcripts of sidebar and chambers conferences that did not involve protectable material were released to the press shortly after the conclusion of the trial.  Approximately 15,000 transcript pages have previously been made available to the public.

motion.  The court received the following responses:  Response to Court's Order to Show Cause

and Opposition to Motion by Bloomberg News, Dow Jones & Co., Inc., The Associated Press,

The Reporters Committee for Freedom of the Press, The Hearst Corporation, and the

Birmingham News Company to Unseal Documents (doc. 523) filed by Michael Martin; United

States' Response to the Motion to Unseal Documents by Bloomberg News, Dow Jones & Co.,

Inc., The Associated Press, The Reporters Committee for Freedom of the Press, The Hearst

Corporation, and the Birmingham News Company (doc. 524);[2] Objections to Motions by

Bloomberg News, Dow Jones & Co., Inc., The Associated Press, The Reporters Committee for

Freedom of the Press, The Hearst Corporation, and the Birmingham News Company to Unseal

Documents (doc. 525) filed by Pat Foster, Larry Taylor, Dan Riviere, Rick Schmitt and Brandon

Hale; Chadbourne & Park LLP's Limited Opposition to Motion to Unseal Documents (doc.

526); Motion to Allow Defendant Additional Time to Respond to the Court's Order of August 8,

2005 Relating to the Unsealing of Sealed Materials Filed by Media Intervenors (doc. 527);

Response of Defendant Richard M. Scrushy to Bloomberg News motion to Unseal Documents

and Motion for Additional Time for Review of Transcript (doc. 530); Response of Defendant

_____

[2]In its original response, the Government merely noted the legal principle that "[t]rial proceedings should be open to the public, unless 'the denial of access is necessary to preserve higher values, and is narrowly tailored to serve that interest.'  *United States v. Valenti*, 987 F.2d 708, 713-14 (11th Cir. 1993)."  (doc. 524)  In an earlier submission, the Government acknowledged certain transcript portions that some of its witnesses requested not be released and to which the Government did not object maintaining under seal.  The Government stated at that time that it did not object to the request to maintain those portions under seal and also requested that the identity of its confidential informant remain undisclosed.  (doc. 503) The court assumes that the Government still adheres to its position stated in doc. 503.  The court also directed the Government's attention to certain other filings that contained information that is not ordinarily made public and that the court deemed necessary to protect, which the court will address in this opinion.  The Government agreed and filed a supplemental response (doc. 540).

Richard M. Scrushy to Bloomberg News Motion to Unseal Documents and Motion for Additional Time for Review of Transcripts (doc. 532); Supplemental Response of Defendant Richard M. Scrushy to Bloomberg News Motion to Unseal Documents and Motion for Additional Time for Review of Transcripts (doc. 534); Response of the United States to the Court's Inquiry as to the Release of Certain Documents (doc. 540); and Supplemental Response of Defendant Richard M. Scrushy to Bloomberg News Motion to Unseal Documents (doc. 545).

In addition, the Intervenors filed a reply to some of the early responses.  Reply by Bloomberg News, Dow Jones & Co., Inc., The Associated Press, The Reporters Committee for Freedom of the Press, The Hearst Corporation, and the Birmingham News Company to Responses to Motion to Unseal Documents (doc. 537).  The Intervenors noted that they had little disagreement with Mr. Scrushy as to which documents and transcripts should be released with redactions or maintained under seal.  For example, the Intervenors acknowledged that "account numbers, identification numbers, addresses and other data that would jeopardize Scrushy's financial or personal security should be redacted or otherwise maintained under seal."  As a result of that acknowledgment, on September 15, 2005, the court released with redactions twenty-eight documents concerning Mr. Scrushy's property that had been subject to restraint during the pendency of the case against him (doc. 538).

The Order accompanying this Memorandum Opinion is the final in a series of Orders that have to this point unsealed a number of documents, orders, and transcripts in this case.[3]  Prior to

---

[3]The court apologizes to the Intervenors for the length of time taken to fully address their request.  The delay was caused by the volume of material that had to be personally reviewed and the press of other court business, much of which had been delayed by the lengthy trial of this case and therefore deserved the court's attention.  The court appreciates the patience of most of the representatives of the Media Intervenors.

this point, the  court has released from seal the entirety of numerous documents and transcripts[4], and has released documents, including exhibits, with redactions that were not at issue.[5]  This Order will address the remaining documents, exhibits, orders and transcripts, most of which will be released with redactions for reasons that will be set out below, and some few materials that will remain under seal.

   I.  Case History

      The court sealed select materials in this case for a number of reasons.  This case was highly publicized –  not only because a CEO of a Fortune 500 company was the target of the investigation, indicted, and tried for fraud – but also because this case was the first trial under the new Sarbanes-Oxley anti-fraud statute.  That publicity could have adversely affected the ability to seat a jury comprised of unbiased individuals who had not already made up their minds about Mr. Scrushy's guilt or innocence.  The heightened publicity began with the search of HealthSouth on March 18, 2003.  The interest grew with the filing of an SEC complaint to seize and restrain all of Mr. Scrushy's assets on March 19, 2003.  Also on that date, Weston Smith, a former HealthSouth CFO, entered a plea of guilty, which resulted in Mr. Scrushy being dismissed from HealthSouth.  Attention continued to increase through the hearing on the SEC asset injunction before Judge Johnson, who entered an Order releasing all of Mr. Scrushy's assets on May 7, 2003.  Additional guilty pleas followed along with a very public grand jury investigation and frequent press releases from the Government, coupled with a running commentary from Mr. Scrushy's attorneys and associates.  By the time Mr. Scrushy was indicted

---

   [4]See Orders docs. 533, 539, and 541.

   [5]See Order doc. 538.

on November 3, 2003, media around the United States had focused upon this case.

    A.     Litigation of Restrained Assets

A substantial portion of the originally sealed documents involved the litigation over Mr. Scrushy's restrained assets.  On November 3, 2003, the Government presented to the court a proposed restraining order, supported by an affidavit from IRS Special Agent Charles Traywick. The court granted this order that essentially froze all of Mr. Scrushy's assets once again.  Mr. Scrushy moved to release some portion of his assets.  Based upon the fact that Mr. Scrushy had substantial wealth prior to the fraud, both the Government and the defense utilized a summary chart prepared by Byron Luke (doc. 59) that showed this wealth to be approximately 100 million dollars in December of 1995.[6]

Because significant disagreement arose over the validity of continued restraint over a substantial portion of what had been seized pursuant to the restraining order, the parties entered into an agreement regarding assets.  The agreement by the parties and a subsequent Order by this court[7] resulted from some "horse-trading" that allowed some assets to be released in exchange for substitute assets placed under restraint, combined with a substantial amount of court oversight.  This Memorandum Opinion and previous Orders unsealing material will make plain the course of this litigation over Mr. Scrushy's assets to anyone interested in taking the time to review the pleadings and orders issued by this court.

The financial estate, which the court had to manage, was large under any standard.  As

---

[6]The indictment alleged, and evidence at trial demonstrated, that the fraud began in the second quarter of 1996.

[7]See Fourth Amendment to the Restraining Order, January 22, 2004, doc. 94.

set out in the Fourth Amendment to the Restraining Order, Mr. Scrushy's assets had to be restrained and at the same time managed to avoid diminishing their worth.  Because Mr. Scrushy is a principal in a company that buys and sells real property, adjustments in the inventory of the company had to be made on an ongoing basis.  When the property to be sold was under restraint, the Defendant and the Government  entered into agreements for interlocutory sales of the property with the proceeds of these sales placed under restraint.  In other words, whenever a restrained asset was sold, the proceeds were substituted for the property and placed under restraint.

In the annals of forfeiture litigation, the court doubts that scarcely any case will exist in which the parties and the court were compelled to work together more frequently than was necessary in this case.[8]  Stock sales were transacted; cars, homes and land were sold; municipal bonds were purchased; and financial institutions changed hands, resulting in the court having to order the movement of millions of dollars of assets among accounts. (See, e.g., doc. 488). Through all of this management, the Government and counsel for the Defendant worked effectively together to conduct this business and provide oversight regarding the numerous accounts and properties that remained restrained until the conclusion of the trial.

Because of the extensive nature of the initial restraining order, zealous representation of both sides, and in the court's overarching duty to guarantee to the maximum extent possible the fair trial rights of both sides in this case, the court and counsel determined that the litigation

---

[8]This case involved 12 interlocutory sale motions and orders, and 39 motions and orders dealing with the management of assets.  On occasion when the proposed sale did not go through, the court was kept abreast of these developments.  (See e.g., docs. 262 and 264 regarding the Citation Jet, and docs. 163 and 404 dealing with the interlocutory sale of West Palm Beach property.)

relating to the Restraining Order had to proceed in court under seal and not in the public sphere. Both sides viewed the issue relating to the restraint of assets as the first beachhead in the long war in this case.

As will be set out in greater detail below and as any fair reading of the many orders in this case will reveal, the court struggled to keep the "gloves on" the litigants and maintain the public statements by both sides in a professional spirit.[9]  The court determined that, by removing the litigation relating to the asset forfeiture and other selected incendiary litigation from the public sphere and placing it under seal, a significant element of public discord between the parties would be muffled.  Indeed, out of the public eye, counsel for both sides reached compromises and worked together in professional ways that could not have been accomplished if they thought the public would view them as "holding hands with the enemy."  Such erroneous public perception of the roles of advocates can interfere with good lawyering and efficient resolution of contentious issues.  The Fourth Amendment to the Restraining Order (doc. 94), reflects an effective and commendable resolution of that once contentious and highly charged restraint of assets issue.

Because the parties reasonably requested that the amended restraining Order would be entered under seal, the orders that followed involving management of restrained assets also were

---

[9]A good example of this struggle can be found in the spirited litigation relating to the Motion of the United States For a Protective Order Restricting Extrajudicial Comments concerning statements made by Defense Attorney Donald Watkins (doc. 140).  The parties initially filed these pleadings publicly and the court decided to seal that material to minimize additional public hype and to resolve the matter by Order.  However, the parties came together and submitted the Protective Order by Consent that, along with a Memorandum Opinion from the court, governed the public comments by the lawyers.  (See doc. 156, along with 140, 144, 149, 152 and 159; also see specifically footnote 1 to the court's Memorandum Opinion of April 13, 2004, doc. 159).

entered under seal.  In addition, the  many motions and orders addressing the restrained assets

included account numbers and identifying information that would not be proper for public

display because of the danger of improper access to and misuse of that information.  The Media

Intervenors agreed that such identifying information should not be made public (doc. 537), and

the court released redacted versions of all[10] those documents by prior Order (doc. 538).

      B.     Public Discourse

Considering the broad array of highly complex issues the court had to manage during the

course of this litigation, paramount in the court's concern was trying to reduce the level of

invective that had permeated the public discussion leading up to and immediately following the

indictment.  This public banter had the potential effect of destroying the possibility of pulling an

impartial jury from the pool of jurors that the court is legally required to utilize to try this case.

The court desired to provide a fair trial to <u>both</u> parties, and some management of the public

statements by the parties and their counsel became part of that process designed to insure a fair

trial.

From the beginning of this case, the court has been concerned  about competing

constitutional rights and interests.  The court has always recognized the First Amendment rights

of free speech by the parties and media, and of public access to court proceedings.  Those rights,

however, had to be balanced with the Sixth Amendment right to a fair trial that, at times, of

necessity received the court's paramount attention in this high profile case.  As the Supreme

_____

[10]As noted *infra*, section II H, a recent review of the docket sheet revealed that some of
the Orders relating to the asset litigation were inadvertently not unsealed by the order unsealing
the motions those orders addressed.  Those orders will be unsealed by the order accompanying
this Memorandum Opinion.

Court has recognized, "[t]ensions between First Amendment rights and the right of an accused to trial by an impartial jury frequently develop in a 'sensational' case like this." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 551 (1976).  That tension became prevalent in this case and required a balancing of rights.

The court attempted to balance some of those rights in the Protective Order by Consent (doc. 158).  That Order sought to weigh the First Amendment rights of the parties, counsel and the press with the need to protect the jury pool from being tainted by improper and unfair comment to ensure a fair trial.  The limitations the court placed on the comments by counsel, however, were little more than a restatement of the ethical restraints on comments imposed by the Alabama Rules of Professional Conduct[11].  See Mem. Op. doc. 159.

---

[11]Rule 3.6, "Trial Publicity," of the Alabama Rules of Professional Conduct reads, in pertinent part:

> (a) A lawyer shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding.

Subsection (b) then lists some of the types of statements concerning jury trials that ordinarily violate subsection (a). Included in that listing are statements concerning

> (1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness . . . ;
> (2) contents of any confession, admission, or statement given by a defendant or suspect . . . ;
> (3) the performance or results of any examination or test or nature of physical evidence expected to be presented;
> (4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case . . . ;
> (5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would

C.      Public and Media Access

The court also took steps to ensure as much media access as possible to court proceedings.  As this court acknowledged when it granted the original motion by members of the media to intervene, "[t]he press plays a vital role in ensuring the public's confidence in the fairness of the justice system.  The court, however, must balance the First Amendment rights of the press and the public's right to know with the rights of the defendant – and society in general – to a fair trial."  (doc. 538.) The court has continually tried to make those balancing decisions consistent with the right to a fair trial and the right of witnesses and jurors to be free from unwarranted intrusion into their private affairs.

Recognizing the important role that access to court proceedings plays in the public's understanding of the legal system, and in response to the Intervenors' request, the court unsealed certain documents and made the docket entries more informative to clearly reflect the nature of the sealed documents.  (Order docs. 533, 538, 539, and 541.)  The court took other action to ensure that the press and the public had adequate access to the public filings and  proceedings in this trial.  For example, the clerk's office, at the direction of the court, established a web page through which the media and interested members of the public were advised of significant filings, orders, and information concerning the schedule and conduct of the trial.  The court accommodated the extraordinary interest in attending this trial by holding it in the largest

---

if disclosed create a substantial risk of prejudicing an impartial trial; or

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

courtroom in the courthouse,[12] arranging for simultaneous viewing of the trial in the jury

assembly room, and providing for a number of reserved seats in the courtroom for media

representatives on the days when the courtroom was full.

    The court also took the most unusual step, at least in this district, of allowing the press

access to interview those jurors who were willing to do so immediately after the return of the

verdict.  As reflected by the jurors' note to the press, they acquiesced to the court's request to

speak with the press, but expressed the desire that they would then be left alone to return to their

private lives.[13]  Despite this most reasonable request in view of their accommodation to the

media, before many of the jurors even reached their homes, members of the press were already

waiting for them.[14]   Other members of the jury reported to court staff that members of the media

hounded them for days after the return of the verdict.

    Also, members of the press were provided with the transcripts of the trial on a "daily

---

[12]Chief Judge Clemon graciously relinquished the courtroom outside his chambers that he normally uses so that the greatest number of people who desired to observe the trial could do so.  Further, the seating area of the courtroom was expanded in anticipation of this and other high profile trials to accommodate public interest.

[13]The statement from the jurors reads: "We the jury after careful consideration of all evidence and reviewing the court's instructions have reached a unanimous decision.  The reason behind our verdict was the lack of substantial evidence and witnesses' credibility.  At this time we are willing to answer a few questions.  However, from this point on we respectfully request the press to allow us to return to our private lives and we do not wish to be contacted.  Thank you for respecting our wishes."  June 28, 2005, TR pp. 2-3.

[14]The court found the presence of journalists at the homes of the *anonymous* jurors puzzling because the names of the jurors were not released until the following day, and the addresses were never made public.  The court had zealously protected the anonymity of the jurors to ensure the integrity of this trial and hopes that the press learned the identity and addresses of the jurors through ordinary investigative skills and not from court or trial personnel in violation of the court's order of anonymity.

copy" basis.[15] The court, however, did not allow the release at that time of sidebar or chambers conferences.  Many of those conferences involved questions of admissibility of evidence, some of which were sensitive or involved information about the personal lives of witnesses or jurors. Because of the demands of this intensive trial, the court could not take the time to read through those transcripts on a daily basis to determine which portions of the non-public conferences needed to be redacted and which portions could be released to the public. At the conclusion of the trial, the court did review the transcripts of those non-public conferences and provided for the release of the vast majority of the sidebar and chambers conference transcripts without waiting for a request to do so from the media.

II.      Analysis and Decisions

Because the documents and transcripts that remain under seal involve materials that raise issues about the propriety of their release, this opinion explains the legal standards that govern the court's discretion in addressing those concerns, and the reasons why certain information will be redacted and why other information will remain under seal.

A.  Chambers Conference Transcripts

The court recognizes – as it always has – that "[t]he public and the press have a *qualified* constitutional right to attend criminal trials." *United States v. Valenti,* 987 F.2d 708, 712 (11th Cir. 1993), citing *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07 (1982)

_____

[15]To meet the need of the attorneys for daily copy, three or four court reporters were involved at times in writing, transcribing, proofreading, and printing transcripts.  The demands of the press on these valiant workers became such that the court had to issue orders admonishing the press to allow these people to do their work unencumbered by their repeated requests for information not being released to them at that time.  See Order Regarding Daily Copy (doc. 387).

(emphasis added). That right, however, is not an absolute right. *Press-Enterprise Co. v. Superior Court of California for Riverside County,* 478 U.S. 1, 9 (1986) ("*Press-Enterprise II*").

A trial court has an historically-recognized right to conduct bench conferences outside the presence of the public and the press. *Globe Newspaper,* 457 U.S. at 609 n.25; *Valenti,* 987 F.2d at 713-14. Indeed, "[b]ench conferences between judge and counsel outside of public hearing are an established practice, ... and protection of their privacy is generally within the court's discretion....Such conferences are an integral part of the internal management of a trial, and screening them from access by the press is well within a trial judge's broad discretion." *United States v. Gurney,* 558 F.2d 1202, 1210 (5th Cir. 1977), *cert. denied Miami Herald Publishing Co. v. Krentzman,* 435 U.S. 968 (1978); see also *Valenti,* 987 F.2d 713-14. The Supreme Court noted that "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle." *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 598 n.23 (1980). Although the court has the recognized discretion to conduct non-public bench or chambers conferences, the public and the press do have a right of access to transcripts of those closed conferences in <u>most</u> – <u>but not all</u> – circumstances. See *Gannett Co. v. DePasquale,* 443 U.S. 368, 393 (1979); *Valenti,* 987 F.2d at 714.

After full consideration of the media's articulated interests, the court has released additional portions of the transcripts of chambers conferences.[16] However, the court finds that the competing privacy interests of the jurors and witnesses whose personal information is referenced in those remaining transcripts outweighs the public's right to know. Therefore, some

---

[16]See Orders, doc. 539, 541; many of these transcripts had not been released earlier for the simple reason that they had not been transcribed. See fn. 1 *supra*.

transcripts will be redacted to remove names and identifying information before release; a few other transcripts will remain under seal for reasons explained below.

1.   Telephone call regarding a *qui tam* action

On April 21, 2005, the court received a call from someone concerning a *qui tam* action[17] against HealthSouth and a conversation that person had with an FBI agent.  The court disclosed the nature of that conversation to the attorneys and that disclosure was contained in a previously released transcript.  (TR pp.10980-82, released by Order, doc. 539).  The transcript of the actual conversation will be released with the redaction of the caller's name for privacy reasons. Transcript of Phone Conference, April 21, 2005, pp. 1-16.

2.   February 7, 2005 *James* Hearing

As required by *U.S. v. James,* 590 F.2d 575 (5th Cir. 1979), before admitting hearsay statements of alleged co-conspirators, the court conducted hearings as to the admissibility of those statements.  Most of those hearings were released after trial as part of the general trial transcript.  The transcript of the *James* hearing concerning Tad McVay's testimony, however, was inadvertently omitted.  That transcript will now be released.  February 7, 2005 TR, pp. 1-33.

B.   Juror Issues

The Supreme Court has acknowledged that personal matters involving jurors may properly be shielded from public display upon release of transcripts.  The Court stated that, upon release of transcripts of juror voir dire, "[e]ven then a valid privacy right might rise to a level that part of the transcript should be sealed, or the name of the juror withheld, to protect the

---

[17]A *qui tam* suit is an action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive. Black's Law Dictionary 578 (2d pocket ed. 2001).

person from embarrassment." *Press-Enterprise Co. v. Superior Ct. of Cal.,* 464 U.S. 501, 512 (1984). Regarding most of the juror issues discussed below, the transcripts are being released with the minimum of redactions necessary to eliminate the name or to exclude identifying information of the juror involved or of the individual providing the information.

In redacting this information, the court follows the lead of two Fifth Circuit decisions that acknowledge a trial court's obligation to protect jurors from unwarranted harassment. *See U.S. v. Brown*, 250 F.3d 907 (5th Cir. 2001); *U.S. v. Edwards*, 823 F.2d 111 (5th Cir. 1987). Both cases held that withholding juror names and identifying information under the circumstances of high-profile cases, similar to this case, was appropriate. *See Brown,* 250 F.3d at 918; *Edwards*, 823 F.2d at 120. The Fifth Circuit specifically held, in *Brown*, that "protecting jurors from post-verdict harassment and invasions of privacy is a legitimate concern." 250 F.3d at 921. That court further noted that "[t]he judge's power to prevent harassment and protect juror privacy does not cease when the case ends." 250 F.3d at 918-19.

When the court released the jurors, it did advise them that they were free to discuss the case and their personal views of it with anyone, including the press. As previously noted, the jurors who agreed to speak with the press immediately after the verdict specifically requested that they "be allowed to return to their private lives," and stated that they did not wish to be contacted. See n. 13 *supra*. Some jurors did later discuss the case with the press. However, as the Fifth Circuit noted, "[c]ommon sense tells us that a juror who has once indicated a desire to be let alone and to put the matter of his jury service behind him by declining to be interviewed regarding it is unlikely to change his mind; and if he does, he is always free to initiate an interview." *U.S. v. Harrelson*, 713 F.2d 1114, 1118 (5th Cir. 1983). The redactions made in the

transcripts being released by the simultaneous order merely attempt to prevent "nagging" of jurors and to address the jurors' privacy rights.

1.  Challenges for Cause

Although the Media Intervenors seek "transcripts," as noted above, transcripts had not been prepared of all hearings and conferences.  The court directed the court reporters to prepare transcripts of all potentially significant conferences and hearings, and those have been addressed by prior orders or in this Memorandum Opinion.  One notable exception remains: no transcripts have been compiled of the hearings on the parties' challenges for cause to potential jurors.

After a thorough voir dire, including written and oral questioning, the court entertained the parties' challenges for cause in a series of hearings over three days.  During those hearings, the court sustained some challenges, and dismissed some persons from consideration as jurors, and overruled other challenges.  Neither side requested transcripts of those hearings and they have not been prepared to date.  The court has no need of such transcripts.  However, if the Media Intervenors desire these transcripts, they can arrange for their preparation at the standard fee from the court reporter.  Upon their preparation, the court will review them and redact any names that may be mentioned for the same privacy issues discussed in this Memorandum Opinion.

2.  Juror Issues Involving Scrushy's Speaking Engagement

The following transcript pages will be released with redactions: February 17, 2005 Meeting with Jurors, pp. 1-3; February 25, 2005 Meeting with Jurors, pp. 1-18; TR pp. 10,277 through 10,300; TR pp. 10,356 through 10,423; TR pp. 10,593 through 10,597; TR pp. 11,166 through 11,193; TR pp. 11,315 through 11,339; TR pp. 11,636 through 11,657; In Chambers

Hearing of April 19, 2005 pp. 1-73; In Chambers Hearing of April 18, 2005, pp.1-158; In

Chambers Hearing of April 22, 2005, pp. 1-32; and May 4, 2005 *ex parte* Conference, pp. 1-11.

These sections of the record involved a speaking engagement by Mr. Scrushy and

resulting furor.  Months before the selection of the jury in this case, Mr. Scrushy had accepted an

invitation to speak at a special celebration service to be held at a church.  After the jury was

impaneled, the court obtained a list of the churches attended by jurors, without juror names or

numbers.  See TR of February 17, 2005 Meeting with Jurors.  In checking that list, Mr. Scrushy

realized that he was scheduled to speak at a special service at a church on the list.  Mr. Scrushy,

through counsel, brought the matter to the court's attention and asked permission to speak at this

special service.  Because this commitment had been made before trial and because it was not the

regular worship service but a special service involving other churches, after discussing the

request with counsel for both sides, the court approved the request with the specific direction to

all jurors that they not attend that function.[18]  See TR February 25, 2005 Meeting with Jurors, pp.

5-6.

Subsequent to that event, the United States Attorney's office received a complaint about

Mr. Scrushy speaking at the church and allegedly making a donation, and the FBI began an

investigation.  The FBI investigation caused concern at the church and these concerns were

brought to the court's attention.  See TR pp. 10,277-10,300.  The court made inquiry about this

investigation because the identity of the juror, who was supposed to be anonymous, was revealed

to people inside and outside of the FBI.  The juror was eventually released.

The court has redacted the names and identifying information about witnesses, the

---

[18]Mr. Scrushy cancelled other engagements at churches on the list that jurors attended.

church, and the juror involved.  The person who complained to the FBI did not attend the service because of disapproval of having a white man speak at the service and, therefore, did not have personal knowledge.  As the court stated when the juror was released, the juror did absolutely nothing wrong in this case and should not be subjected to any additional harassment or embarrassment.  *See* TR pp. 11682-83.  The court released the juror to avoid any possible recriminations relating to the events set out in these portions of the transcript.  Additionally, the confidential witness who testified did nothing wrong and likewise should not be harassed or embarrassed for appearing before the court.   The court desires to protect the juror, these witnesses and the church from any additional harassment, and is taking the least restrictive means possible to provide the public access to the pertinent aspects of the investigation.

The release of the juror did not end the furor created by the FBI investigation.  Although the facts of the investigation were under seal, somehow members of the press learned the identity of a church *suspected* to be involved and began what can only be described as harassment of a pastor and the released juror.  The transcript reflects subsequent reports to the court of someone harassing a pastor, even including a night visit to his house.  The court hopes that with the release of the redacted transcripts, the harassment will cease.  The court finds that these redactions are necessary to prevent the juror and witnesses from further becoming "unwilling pawns in the frenzied media battle over" this case.  See, *Brown*, 250 F.3d at 921.

3.  "Rumor upon Rumor"

The court is releasing redacted doc. 480, redacted doc. 481, and the transcripts of the in-chambers hearing of June 2, 3, 7, and 8, 2005, pp. 1-303, with redactions.

These documents and transcript relate to an inquiry made by the court on motion of the

18

Defendant (doc. 480) regarding possible out-of-court statements <u>allegedly</u> made by a juror during deliberations.  The juror's name, number, and identifying information are redacted to provide for that juror's privacy.  In addition, the court has redacted the names of the witnesses and identifying information about them.  These people reluctantly came to court to assist in the court's investigation of what turned out to be merely loose tongues attributing statements to a juror that they themselves had made.  The court can see no useful purpose in disclosing the names of people who were questioned about these unfounded rumors.

This investigation reminded the court of the "rumor" game where one person whispers a "secret" to another person, and that "secret" is passed around the room.  What the last person hears inevitably bears no resemblance to the original "secret."  Such was the case with this investigation.   The court found no merit to the allegations, denied the Defendant's motion to dismiss the juror,  and the juror remained in service through the verdict.

4.  Juror Personal Issues

 Pages 9471 through 9472 of the transcript will be released with redactions.  The only information redacted is the juror's name and the specific issue involved to protect his or her privacy.  As this is a typical juror issue, the court finds that this portion of the record can be unsealed in redacted form without undue embarrassment to any juror.

5.  Juror Disclosure

Transcript pages 13,568 through 13,572 will be released with redactions.  This transcript reflects a communication between the court and a juror relating to a disclosure made by the juror after hearing testimony about a company named Scandipharm.  The court finds that with redaction of the juror's identification number the transcript should be released.

6.  Juror's Brother

The transcript of an in-chambers hearing of May 27, 2005, pages 1-5, will be released with redactions.  The court is releasing this transcript with only the juror's name redacted for privacy purposes.  This transcript shows the depth of dedication of the jury in this case.  Although the juror's brother was dying of cancer, and eventually died during the deliberations, this juror remained with the jury, even though the court would have released her had she indicated that she could not continue.

7.  Juror Health and Other Personal Issues

Transcript pages 8607 through 8613, and 8645 through 8648 involve the court's communications with jurors regarding health issues and will be released with redactions.  Included in these pages are discussions about a juror who was released with viral meningitis; another juror who sought leave to attend a funeral, which was denied; and yet another juror who was expecting his/her first grandchild during the trial and did not request any special accommodation.  These issues involve the personal matters of the jurors, they would provide the public no broader insight into the trial, and the court will redact the names and numbers of jurors to protect the privacy of the jurors.

8.  Juror Employment Issue

Transcript pages 11,131 through 11,141 will remain sealed.  This portion of the transcript deals with employment issues the court encountered regarding one juror.  This transcript will remain sealed because releasing it will embarrass the juror and providing this information will add nothing to the public's knowledge of the events in this case.  Redaction would not be effective in this situation.  The court is releasing, however, with redactions TR pages 9471-72

20

that contain the court's discussion with counsel about how to address the issue.  The employment issue was resolved favorably so that the juror remained in service to the conclusion of the trial.

 C.  Motions in Limine

 Prior to trial, the Government and Defendant filed numerous pre-trial motions in limine. Those motions and the transcript of the hearing concerning them have previously been released. See Order dated September 20, 2005, doc. 539.  During trial, the Government filed additional motions in limine on which the court conducted hearings in chambers.  Most of these motions in limine were previously released. Documents 406 and 407[19], and the transcripts of the hearings on all these motions in limine made during trial will remain under seal, as explained below.

 Throughout the course of trial, the Government anticipated that the defense might seek to elicit information about unsavory conduct of Government witnesses to discredit them. Therefore, the Government filed several motions in limine, and made other oral motions, to preclude the defense from making inquiry into such alleged conduct.  Those motions were filed under seal, and were previously released.  See docs.  383, 388, 389, and 401; see Order, September 6, 2005, doc. 533.

 Immediately after trial, when the court released most of the sidebar and chambers transcripts, several of the Government's witnesses filed motions to prevent release of certain of

---

 [19]Document 406 and 407 will remain sealed, but the docket clerk is directed to change the docket entries to more accurately describe those documents.  Document 406 should read: "Government's Motion to Preclude Questioning Concerning a Witness's Financial Matters." Document 407 should be described as "Defendant's Response in Opposition to Government's Motion to Preclude Questioning Concerning a Witness's Financial Matters."

those transcripts.  E.g., Kenneth Livesay (doc. 414)[20]; Michael Martin (doc. 504); Aaron Beam

(501, 502).  The court granted those motions on July 8, 2005.  Some of those witnesses renewed

their opposition, and additional witnesses filed oppositions to releasing portions of transcripts in

response to the court's order to respond to the Media Intervenors' motion to unseal.  E.g.,

Michael Martin (doc. 523); Pat Foster, Larry Taylor, Dan Riviere, Rich Schmitt, and Brandon

Hale (doc. 525); and Malcolm "Tad" McVay (doc. 543, 544).

The court previously reviewed the actual filed motions in limine and found that those

motions – with one exception – could be released in redacted form and so ordered.  The one

exception – doc. 406 and the responsive doc. 407 – so interweave the factual allegations

successfully excluded with the legal arguments that redactions would be ineffective.  To unseal

doc. 406 and doc. 407 even with substantial redactions would circulate accusations that could not

be tested because the necessary redactions would shield the very information needed to test the

allegations.  *See U.S. v. Amodeo*, 71 F.3d 1044, 1052 (2d Cir. 1995).  Therefore, doc. 406 and

407 will remain sealed.

The transcripts of the discussions of all those motions in limine will remain sealed.  The

court recognizes that it should seek the least restrictive means in determining whether to shield

transcripts from public view.  However, these matters were presented to the court for an *in

camera* determination of whether they were relevant in any way to the issues in the case or the

credibility of the witnesses.  The court, following strong precedent, found that they were not.

In determining that the transcripts of these hearings should not be made public, the court

_____

[20]Document 414 will be released with redactions.  The other motions, doc. 504, 501,
and 502, were previously unsealed.

has determined that the privacy rights of these witnesses outweigh any public interest.  The Eleventh Circuit has recognized the propriety of sealing from public view bench conferences regarding admissibility of anticipated impeaching evidence.  *In re Tribune*, 784 F.2d 1518, 1522 (11th 1986).  Further, matters that come before the court solely to determine their relevance carry an extremely light presumption of media access; that light presumption may be overcome by countervailing reasons, such as the privacy rights of witnesses.  *See Amodeo*, 71 F.3d at 1050.

In their reply, the Media Intervenors acknowledge that they "have no interest in gaining access to purely personal information that has no bearing on these proceedings; however, the Media Intervenors, and the public, do have an interest in gaining access to information that bears in some way on these proceedings, whether the Court deemed it relevant or not."  (doc. 537, p. 10).  That the court generally agrees with the right to access is demonstrated by the large number of sidebar and chambers conference transcripts the court has released.  These transcripts, however, do not fall into the category of bearing *in any way* on the proceedings.

The exclusion of such allegations that the Government and witnesses feared might be offered by the defense did not affect the outcome of the trial.  The release of transcripts of discussions of these allegations would not further the public's understanding of the trial. Instead, the only result would be to further embarrass these witnesses with unsubstantiated allegations of misconduct unrelated to activities at HealthSouth.  While these witnesses – admitted co-conspirators – are not "innocent third parties," the court agrees with the following statement by the Second Circuit:

> We have previously held that privacy interests of innocent third parties should weigh heavily in a court's balancing equation . . . .  Courts have long declined to allow public access simply to cater to a morbid craving for that which is sensational and impure.

> . . . .  Financial records of a wholly owned business, family affairs,
> illnesses, embarrassing conduct with no public ramifications, and
> similar matters weigh more heavily against access than conduct
> affecting a substantial portion of the public.

*Amodeo*, 71 F. 3d at 1050-51 (emphasis added).

To release these transcripts would do no more than "cater to a morbid craving" for sensationalism.  For the most part, the general nature of those allegations are outlined in the written motions that have already been released, and which were granted.  Redacting names would not be sufficient to protect the privacy rights of these witnesses.  A minimum of detective work would link the portions of the transcripts to the witnesses who were on the stand or about to take the stand.  The reporters covering this case have already demonstrated their aptitude for investigation.  Therefore, having considered less restrictive options, the court finds that maintaining these few transcript portions under seal is warranted.  Withholding these transcripts does not deprive the public of information that had any bearing on the trial.

The following transcript portions, therefore, shall remain sealed: TR Vol. II, pp. 686-703; TR Vol. III, pp. 706-724; TR Vol. 20, page 5803 line 8; page 5997 lines 13-17; page 6276 line 8 through page 6282 line 14; page 7200 line 14 through page 7216 line 3.

D.  Attorney – Client Privilege

Chadbourne & Parke LLP, Mr. Scrushy's former defense firm, filed an objection to the release of the transcript of the November 17, 2004 chambers conference (doc. 526).  The Media Intervenors took issue (doc. 537, pp. 8-9).  The court finds that the continued sealing of this transcript is necessary to protect the attorney-client privilege.[21]  Therefore, the transcript of the

---

[21]The Intervenors assert that Mr. Scrushy waived the attorney-client privilege because he did not assert it in his initial response.  The transcript of that conference had not been

November 17, 2004 conference will remain sealed.

On November 17, 2004, the court conducted an in chambers conference with Mr. Scrushy and his former and future trial team members to address issues surrounding the withdrawal of the Chadbourne Parke firm.  The purpose of the meeting, from the court's perspective, was to emphasize to Mr. Scrushy that the change of counsel would <u>not</u> affect the January 2005 trial date, and to simultaneously ensure, as far as possible, that the change of counsel would not be an issue on appeal, if Mr. Scrushy were convicted.  Indeed, the main reason the court had a court reporter present was to have a clear record of all the steps taken to effectuate an orderly transition of trial counsel and thus remove a potential issue for appeal.

Other courts have recognized the important attorney-client privilege as a countervailing interest to the public's right of access and have found it deserving of protection.  See, e.g., *Siedle v. Putnam Inv.,* 147 F.3d 7, 11 (1st Cir. 1998) (holding the need to protect the attorney-client privilege to be "precisely the kind of countervailing concern that is capable of overriding the general preference for public access to judicial records."); *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 462 (10th Cir. 1980) (concluding that public's interest in preserving the attorney-client privilege outweighs the public's more general interest in access to court documents); *The Diversified Group Inc. v. Daugerdas*, 217 F.R.D. 152, 160 (S.D.N.Y. 2003) ("[T]he public has a significant interest in preserving the confidentiality of attorney-client communications.")

This hearing involved sensitive issues dealing with the transition of responsibilities and

_____

prepared at the time of Mr. Scrushy's initial response – or even when Chadbourne filed its motion – so it was not before him to "waive."  His subsequent response, doc. 545, asserted the privilege.  The court finds that Mr. Scrushy did not waive any  privilege regarding these matters.

materials from one group of lawyers to a second group who were to eventually try this case.  The matters discussed with the court were not intended for public consumption and were recorded for the remote prospect that the court would have to take further action to see that Mr. Scrushy's new trial lawyers had all the materials they needed to prepare for trial, and to remove from becoming an issue on appeal any potential argument that Mr. Scrushy was disadvantaged by the change of defense teams.  No further action was required from the court.

Furthermore, this conference did not address any substantive issues related to the trial of the case.  The discussions played no part in the motions, hearings or evidence relevant to the determination of the case.  As such, the First Amendment right of access does not attach.  See *U.S. v. Smith*, 787 F.2d 111, 115 (3rd Cir. 1986) (holding that First Amendment right of access applies to some sidebar and chambers conferences under certain circumstances, in which evidentiary or other substantive rulings were involved, but expressly declining to extend right of access to conferences relating only to collateral matters).

The court has reviewed the entire transcript of the November 17, 2004 conference.  Communications protected by the attorney-client privilege so permeate the transcript that redaction would be impracticable in this instance.  This material is privileged and will remain under seal.

E.  Trial Exhibits

Almost all exhibits admitted into evidence were released to the public at the end of the trial day when they were received into evidence.  A few exhibits were admitted and presented to the jury, but because they contained personal financial information of witnesses or other identifying financial records, they were not publicly released.  Those exhibits are discussed

below in subsection 1.  Exhibits that were offered but not admitted are discussed below in

subsection 2.  A few exhibits were admitted for a limited purpose and were not presented to the

jury; those exhibits are discussed below in subsection 3.  The court does not have exhibits that

were listed by the parties but never offered.

　　　1.  Admitted but Not Released

　　　During the trial, the court released at the end of each trial day copies of the exhibits

admitted into evidence that day.  A few of the admitted exhibits were not released to the public

because they contained financial information or other personal information.  The following

exhibits were presented to the jury but not provided to the press:  GX WTO-A, Owens' federal

tax returns; GX 280-A, Verizon phone numbers; GX 280-B, Verizon phone numbers; GX 280-

D, Phone lists; GX 800-068 through GX 800-075, PeopleSoft print outs of employee earnings;

GX 800-291, Smith Barney bank statements; GX 800-292, Smith Barney bank statements; GX

800-293, AmSouth bank statements; DX 6009, transcript of testimony of Pat Foster (redacted);

and DX 6010, transcript of testimony of Larry D. Taylor (redacted).[22]  These exhibits will not be

released for the reasons stated below.

　　　 These exhibits consist of hundreds of pages containing primarily confidential financial

or other sensitive personal information.  The court invited counsel for the Media Intervenors

along with a reporter to review the exhibit lists and identify which specific exhibits they desired

to have released.  Neither counsel nor their clients accepted this invitation, and this court will not

speculate as to which exhibits the Media Intervenors desire to see.  Had the Intervenors made a

---

　　　[22]The trial transcript of May 10, 2005 contains the portions of the testimony of Foster
and Taylor from the SEC asset freeze hearing that were read to the jury, and thus are available
to the press.

specific inquiry, the court could have reviewed those specific exhibits to determine if the sensitive information could have been redacted.  Because of the voluminous nature of these documents and this court's resource constraints, the court will not review those exhibits to see if redactions could be made so they could be released.

One exhibit that was admitted but not previously released does not contain voluminous sensitive information and can, therefore, be released without redaction.  Government Exhibit 701-010 is a DVD copy of a videotape of a HealthSouth corporate show and will be made available in its entirety, even though only a portion was played for the jury.  The Government will be directed to make copies of this DVD for the Intervenors.

2.  Offered but Excluded

The Media Intervenors assert that they have a right to exhibits that were offered but not admitted into evidence.  See doc. 537, p.6.  The Intervenors cite no controlling law for their position and the court could find none.  As a general rule, however, documents that are not part of the public record do not fall within the press's First Amendment rights of access.  See *United States v. Gurney*, 558 F.2d 1202, 1209 (5th Cir. 1977);  *U.S. v. Brown*, 250 F.3d 907, 914 (5th Cir. 2001).

This case involved hundreds of thousands of documents and potentially thousands of exhibits.[23]  The parties, however, demonstrated substantial restraint, offering into evidence only the most relevant exhibits.  Therefore, the number of offered but not admitted exhibits is

_____

[23]The Government Exhibit list totals 124 pages.  The numbering system used by the Government makes totaling the number of proposed exhibits impossible without doing an individual count.  Based on an estimate, the list contains more than 1500 exhibits.  The Defendant's Exhibit list comprises 120 pages and 1623 exhibits.

relatively[24] small.  Twenty-three exhibits were offered but not admitted into evidence, and thus, not previously released to the press.

To aid the court in determining which of these exhibits, if any, were really at issue, as previously noted, the court invited counsel for the Media Intervenors along with a reporter to review the official exhibit lists to identify which non-admitted exhibits they desired released. The Intervenors did not accept the court's invitation.  The court lacks the time, resources, and inclination to review potentially hundreds of pages of exhibits that never were part of the jury's consideration to determine whether they might contain any information that would aid the public's understanding of the trial, or whether a countervailing interest would require redaction or sealing.  Absent controlling case authority, and without the requested assistance from the Intervenors to focus their request, the court will not release exhibits that were not admitted at trial.

3.  Admitted for Limited Purpose

The court did admit for a limited purpose one series of exhibits that actually were not presented to the jury.  A major part of the trial focused on the tape recordings secretly made by Bill Owens on March 17 and 18, 2003.  The Government offered <u>portions</u> of the tapes and transcripts, which were admitted under exceptions to the hearsay rule.[25]  The defense sought to have additional portions admitted.  Because these additional portions, however, constituted

---

[24]The emphasis here is on the word "relatively."

[25]In the numbering system of the 700 series of Government exhibits, any exhibit number with an "R" reflects a redacted transcript of only the portion of the tape actually admitted into evidence and played for the jury.  The redacted transcripts were released to the press during the trial.

hearsay to which no exception applied, the court refused to allow these additional portions to be played for the jury.  See TR February 7, 2005 Chambers Conf., pp. 1-87.

Had Mr. Scrushy been convicted, the exclusion of those portions of the tapes he sought to have admitted certainly would have been a major issue on appeal.  For the sole purpose of being absolutely sure those tapes and their transcripts were included in the record on appeal, they were admitted into the record for that limited purpose with the specific notation that they were <u>not</u> to be given to the jury or to the press.

Because these tapes and transcripts were not admitted into evidence and, therefore, did not become part of the evidence considered by the jury, these tapes GX-701-002A and 701-003A will not be released.  However, the court is releasing the transcript of the in chambers conference evidentiary  hearing concerning the defense's request to play additional portions of the tapes, February 7, 2005 Transcript, pp. 33-87 to aid in the public's understanding of why additional portions of the tapes were not admitted in evidence.  This release, however, should <u>not</u> be viewed by anyone as any precedent for a general principle that transcripts of conferences concerning non-admitted exhibits should be released as a matter of course.

F.  Materials Related to Discovery Requests

1.  Government's Memorandum Concerning Confidential Informants (doc. 334)

Prior to the trial, the defense moved for the disclosure of any confidential informants used by the Government (doc. 245).  Magistrate Judge Putnam denied the motion in part, but out of an abundance of caution, directed the prosecution to submit to the court *ex parte* and under seal a summary description of the substance of the information provided by each confidential informant (doc. 293).  The Government filed a memorandum summarizing that information and

attached copies of FBI 302's[26] (doc. 334).  After an *in camera* review, the court concluded that the information was irrelevant to the issues in this case, and, therefore, the Government did not need to disclose that information.

In the Government's response filed September 26, 2005, (doc. 540) it specifically stated that it did not oppose unsealing the Memorandum, but did object to releasing the FBI 302's attached to it.  The court agrees with the Government's position.  The memorandum filed by the Government summarizes the substance of the information provided by the confidential informants and will be released.  The actual reports, however, will not be released.

Upon review of the reports of interviews with these confidential informants, the court found that the information they provided – though relevant to a <u>different</u> investigation – bore no relevance to the issues involved in <u>this</u> trial.  Therefore, the release of these reports would not aid anyone in understanding the proceedings in this case.

On the other hand, the release of these FBI reports could adversely affect legitimate law enforcement interests.  As the Second Circuit has observed:

> Officials with law enforcement responsibilities may be heavily reliant upon the voluntary cooperation of persons who may want or need confidentiality.  If that confidentiality cannot be assured, cooperation will not be forthcoming.  Although courts have compulsory process available to compel the giving of evidence or the production of documents, cooperation is also essential to judicial efficiency.  If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access.  *See United States v. Valenti*, 987 F.2d 708, 714 (11th Cir.) (Affirming district court's refusal to unseal transcripts of *in camera*

---

[26]A "302" is the report made by a FBI agent of an interview with a witness.  It is not a verbatim report of a witness's statement, and rarely does the witness see the report or have an opportunity to review it.

proceedings on the ground that it would damage continuing law enforcement investigations), *cert. denied,* 510 U.S. 907, 114 S.Ct 289, 126 L.Ed.2d 238 (1993).

*Amodeo*, 71 F.3d at 1050.

Releasing these 302's and the identities of the private citizens who were cooperating in the Government's investigation would likely have a chilling effect on future cooperation. The court does not need to consider redacting these documents then releasing them because the substance is contained in the Government Memorandum that the court is unsealing.

Therefore, document 334, the memorandum will be unsealed, but the exhibits attached to it will remain sealed.

2.  Transcript November 17, 2004 Discovery Conference

Because of the voluminous amount of documents and the extensive discovery involved in this case, the court and Judge Putnam were more heavily involved in discovery matters than in most criminal cases. As is customary, not all of the discovery-related conferences were covered by a court reporter or transcribed. An exception is the discovery conference held on November 17, 2004.

Chambers conferences concerning discovery matters are precisely the types of matters to which the public has a limited right of access. See discuss *infra* Sec. II. A. The court finds, however, that the ninety-five page transcript of this discovery conference may shed some light on the complexity and magnitude of pretrial preparations by both sides. This transcript will be ordered filed with only a few redactions of the name and identifying information of a potential witness who did not testify at the trial. The release of this transcript, however, should not be viewed as a recognition of any general right of access to such discovery-related information on a

regular basis.

G.  Grand Jury Matters

1.  Report and Recommendation Regarding Grand Jury Issue and Attachment (doc. 157)

In response to an allegation by the defense that the Government may not have adequately screened persons with a bias related to HealthSouth from serving as grand jurors, Magistrate Judge Putnam reviewed *in camera* grand jury transcripts.  He then issued a Report and Recommendation, in which he found that sufficient instructions were given to the grand jurors and inquiries made of them to avoid participating in the case if they had any bias or connection with HealthSouth, and he recommended denial of the motion to dismiss.

The Government does not oppose unsealing the Report and Recommendation but does "strongly object" to the release of any grand jury transcripts.  (doc. 540).  The court agrees that the grand jury transcripts must remain sealed, but the Report and Recommendation can be released.

The secrecy of grand jury proceedings is virtually sacrosanct.  No common law right of access attaches to grand jury materials that have historically been inaccessible to the public and the press.  *U.S. v. Smith*, 123 F.3d 140, 156 (3rd Cir. 1997).

As the United States Supreme Court has said

> We consistently have recognized that the proper functioning of our grand jury system depends on the secrecy of grand jury proceedings.  *See, e.g., United States v. Proctor* [356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)].  In particular, we have noted several distinct interests served by safeguarding the confidentiality of grand jury proceedings.  First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony.  Moreover, witnesses who appeared before the grand jury would be

> less likely to testify fully and frankly, as they would be open to
> retribution as well as to inducements.  There also would be the risk
> that those about to be indicted would flee, or would try to
> influence individual grand jurors to vote against indictment.
> Finally, by preserving the secrecy of the proceedings, we assure
> that the persons who are accused but exonerated by the grand jury
> will not be held up to public ridicule.

*Douglas Oil of Calif. v. Petrol Stops Northwest,* 441 U. S. 211, 218-19 (1979).

No reason exists to disclose the transcripts of the grand jury proceedings.  Therefore, although the Report and Recommendation (doc. 157) will be released, the transcripts attached to it will remain sealed.

2.  Defendant's Additional Grand Jury Probe

The Defendant also moved for an *in camera* review of grand jury materials concerning the death of William Massey, Jr., and the HealthSouth Security Department.  (See doc. 355 previously unsealed.)  The Government's response to that motion was filed under seal (doc. 361).  The court reviewed the relevant portions of grand jury testimony and denied the Defendant's further request that additional grand jury materials be provided to the defense (doc. 374).

As noted, the court previously unsealed the Defendant's motion.  The Government's response (doc. 361) and the court's order (doc. 374) should also be unsealed.  However, the grand jury testimony the Government submitted to the court of *in camera* review will not be released for the same reasons stated above.

H.  Miscellaneous

1.  Initiating Documents.

The *Ex Parte* Application of the United States for Post-Indictment Restraining Order

(doc. 9), the *Ex Parte* Application of the United States for Issuance of Writ of Entry (doc. 11),
and the Affidavit for Search Warrant (docs. 13-14) are ordered unsealed with redactions. The
redacted information is either information for property or account numbers; that information is
redacted because it is not necessary to complete the public's knowledge and redaction is
necessary to protect against any possibility for mischief. Attachment 1, which is referenced in
the Writ of Entry and the Restraining Order filed on November 3, 2003, is also released in
redacted form.

    2. Overlooked Documents.

    A personal review by the court of the ninety-five-page docket sheet revealed several
orders and documents under seal that should have previously been unsealed but were
inadvertently overlooked. The following documents will be unsealed:

| | |
|---|---|
| Doc. 404 | Consent Interlocutory Sale Order (with redactions) |
| Doc. 312, 313, 314, 315, 316, 317 | Government Responses to Motions in Limine filed by Defendant Scrushy (the Motions in Limine docs. 286, 287, 288, 289, 290, and 291 were unsealed by order of September 8, 2005) |
| Doc. 331, 332, 333 | Orders concerning Defendant's Motions in Limine |
| Doc. 347, 348, 438, 439 | Consent Orders concerning interlocutory sales (with redactions of financial account identifiers) |
| Doc. 381 | Order Concerning Anonymous Jury Matters |
| Doc. 391 | Order regarding Owens' divorce papers. |
| Doc. 482 | Letter to Clerk of court from Government, filing |

                                      Government's Exhibits concerning its appeal of the court's April 12, 2005 Order; however, the attachments, which were excluded from evidence, will not be released for the reasons state above.

Doc. 493                              Order Regarding Juror Matters.

3.  Docket Entries

Two docket entries on May 18, 2005 addressed Motions, doc. 447, 451, 452, previously unsealed should likewise be unsealed.

Another docket entry of July 8, 2005 regarding Motions, doc. 501 and 502, previously unsealed, will also be unsealed.

Additionally, the docket entry for document 511, the transcript regarding jury charge conferences, will be corrected.  That transcript <u>was</u> released immediately after the verdict.  The docket entry reflecting this transcript as sealed is in error.  The court did not order the transcript sealed and never intended that it be.  Therefore, the docket entry will be corrected to show that the transcript is not sealed.

4.  Government's Trial Brief

The Government's Trial Brief submitted to the court on December 30, 2004 was not filed.  The brief will be ordered filed and released.

An order effectuating the rulings discussed in this Memorandum Opinion will be filed simultaneously.

DONE and ORDERED this 23rd day of November 2005.

_Karon O. Bowdre_

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE